CLERK US DISTRICT COURT
NORTHERN DIST. OF TX
FILED

2018 MAR -2 AM 10: 53

DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION**

| | | |
|---|---|---|
| KAREN LORRAINE STAHL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | No. 1:16-CV-0173-BL |
| | § | |
| NANCY A. BERRYHILL,[1] | § | |
| Acting Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

## REPORT AND RECOMMENDATION

Pursuant to 42 U. S. C. § 405(g), Plaintiff/Claimant seeks judicial review of a decision of the

Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance

Benefits ("DIB") under Title II of the Social Security Act and Supplemental Security Income ("SSI")

under Title XVI of the Act.[2] *See* Compl. (doc. 1). The Commissioner has filed an answer, *see* Def.'s

Answer (doc. 10), and a certified copy of the transcript of the administrative proceedings, *see* SSA

Admin. R. [hereinafter "R."] (doc. 12), including all hearings before the Administrative Law Judge

("ALJ"). The parties have briefed the issues. *See* Pl.'s Mem. (doc. 15); Comm'r's Br. (doc. 16).

The United States District Judge referred the case to the undersigned pursuant to 28 U.S.C. § 636

and the parties have not consented to proceed before a United States Magistrate Judge. After con-

sidering the pleadings, briefs, and administrative record, the undersigned recommends that the Court

affirm the Commissioner's decision.

---

[1]On January 20, 2017, Nancy A. Berryhill replaced Carolyn W. Colvin as the Acting Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d), the Court automatically substitutes her as the named defendant.

[2]Title II governs disability insurance benefits, *see* 42 U.S.C. §§ 401-34, and Title XVI governs supplemental security income for the aged, blind, and disabled, *see id.* §§ 1381-1383f. Final determinations under Title XVI are subject to the same judicial review as provided in § 405(g). *See* 42 U.S.C. § 1383(c)(3). The Court will often refer to Plaintiff as Claimant, a designation used in social security cases.

## I.    BACKGROUND

Plaintiff filed applications for DIB and SSI in December 2012 and May 2013, respectively, alleging disability beginning August 1, 2011. R. 196-99. She claimed to be disabled due to various physical and mental impairments. R. 216. As calculated by the ALJ, her date of last insured ("DLI") is December 31, 2013. *See* R. 13, 15. Therefore, the most relevant time period for her applications and the Court's review commenced August 1, 2011, and continued through December 2013. Nevertheless, medical records from outside that period remain relevant to the extent they are indicative of Plaintiff's physical or mental condition during that period of time.

The Commissioner denied the applications initially and on reconsideration. *See* R. 112, 118-19, 122, 126-27. On June 24 and December 15, 2014, Administrative Law Judge ("ALJ") William H. Helsper held hearings on Plaintiff's claims. *See* R. 30-68. On February 26, 2015, the ALJ issued an unfavorable decision finding that Plaintiff was not disabled and was capable of performing her past relevant work. R. 13-24. Applying the sequential, five-step analysis set out in the regulations (20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4))[3] the ALJ first determined that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. R. 14-15. The ALJ next determined that Plaintiff suffers from the following severe impairments: fibromyalgia, degenerative disc disease, sacroiliitis, arthritis, and chronic pain syndrome. R. 16-18. He found a migraine headache impairment non-severe. R. 16. Third, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of any impairment in the listings.[4] R. 18-19.

---

[3]In March 2017, the Social Security Administration amended many regulations. However, the pertinent version for this case is the one in effect when the ALJ issued his decision. *See Young v. Berryhill*, No. 16-20786, 2017 WL 2312859, at *2 n.3 (5th Cir. May 26, 2017) (per curiam). Except to bring attention to the effective date of an amended provision, this recommendation will cite to the applicable version without parenthetical year information.

[4]Sections 404.1525 and 416.925 explain the purpose and use of the listings of impairments.

The ALJ then determined that Plaintiff retained the residual functional capacity ("RFC")[5] to perform medium work as defined in 20 C.F.R. §§ 404.1567(c), 416.967(c).[6] R. 19-23. Given her severe impairments, she could perform "detailed but not complex tasks." R. 19. The ALJ found that Plaintiff could (1) lift/carry twenty-five pounds frequently and fifty pounds occasionally; (2) stand or walk up to six hours; and (3) sit for that same amount of time in an eight-hour workday. *Id.*

Based upon the RFC determination and testimony from a vocational expert ("VE") about the exertional demands and skill requirements of Plaintiff's prior jobs, the ALJ concluded that Plaintiff could perform her past relevant work as a nurse aide. R. 23. At Step 4 of the sequential analysis, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act between August 1, 2011, and the date of the ALJ's decision. *See* R. 24.

The Appeals Council received and considered an attorney brief (Ex. 20E) when it denied review on July 25, 2016. *See* R. 1-4. The ALJ's decision is the Commissioner's final decision and is properly before the Court for review. *See Higginbotham v. Barnhart*, 405 F.3d 332, 334 (5th Cir. 2005) (stating that the Commissioner's final decision "includes the Appeals Council's denial of [a claimant's] request for review").

Plaintiff commenced this social security appeal on September 23, 2016. *See* Compl. She presents three issues for review. *See* Pl.'s Mem. at 4.

---

[5]Sections 404.1545(a)(1) and 416.945(a)(1) explain that a claimant's RFC "is the most [he or she] can still do despite [his or her] limitations." When a case proceeds before an ALJ, it is the ALJ's sole responsibility to assess the claimant's RFC. 20 C.F.R. §§ 404.1546(c), 416.946(c). However, that assessment must be "based on all of the relevant medical and other evidence" of record. *Id.* §§ 404.1545(a)(3), 416.945(a)(3).

[6]The regulations address physical exertion requirements and explain: "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. §§ 404.1567(c), 416.967(c).

3

## II.    LEGAL STANDARD

In general,[7] a person is disabled within the meaning of the Social Security Act, when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). "'Substantial gainful activity' is work activity involving significant physical or mental abilities for pay or profit." *Masterson v. Barnhart*, 309 F.3d 267, 271 n.2 (5th Cir. 2002) (citing 20 C.F.R. § 404.1572(a)-(b)); *accord* 20 C.F.R. § 416.972(a)-(b). To evaluate a disability claim, the Commissioner employs the previously mentioned

> five-step sequential analysis to determine whether (1) the claimant is presently work-ing; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment listed in appendix 1 of the social security regulations; (4) the impairment prevents the claimant from doing past relevant work; and (5) the impairment prevents the claimant from doing any other substantial gainful activity.

*Audler v. Astrue*, 501 F.3d 446, 447-48 (5th Cir. 2007). If, at any step, the Commissioner determines that the claimant is or is "not disabled, the inquiry is terminated." *Id.* at 448. The Commissioner must assess the claimant's RFC before proceeding to Steps 4 and 5. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). For Steps 1 through 4, the claimant has the burden to show disability, but the Commissioner has the burden at Step 5 to "show that there is other substantial work in the national economy that the claimant can perform." *Audler*, 501 F.3d at 448. If the Commissioner carries that Step 5 burden, "the burden shifts back to the claimant to rebut th[e] finding" that he or she can perform other work that is available in the national economy. *Newton v. Apfel*, 209 F.3d

---

[7]The Act provides an alternate definition of disability for individuals under the age of eighteen, *see* 42 U.S.C. § 1382c(a)(3)(C), and blind individuals who are fifty-five years of age or older, *see* 42 U.S.C. § 423(d)(1)(B). These provisions are inapplicable on the current facts.

448, 453 (5th Cir. 2000).

"Judicial review of the Commissioner's decision to deny benefits is limited to determining whether that decision is supported by substantial evidence and whether the proper legal standards are applied." *Sun v. Colvin*, 793 F.3d 502, 508 (5th Cir. 2015) (quoting *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001)). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept to support a conclusion' and constitutes 'more than a mere scintilla' but 'less than a preponderance' of evidence." *Hardman v. Colvin*, 820 F.3d 142, 147 (5th Cir. 2016) (quoting *Newton*, 209 F.3d at 452). "In applying the substantial evidence standard, the court scrutinizes the record to determine whether such evidence is present, but may not reweigh the evidence or substitute its judgment for the Commissioner's." *Perez*, 415 F.3d at 461. The courts neither "try the questions *de novo*" nor substitute their "judgment for the Commissioner's, even if [they] believe the evidence weighs against the Commissioner's decision." *Masterson*, 309 F.3d at 272. The Commissioner resolves conflicts of evidence. *Sun*, 793 F.3d at 508.

## III.    ANALYSIS

This appeal raises the following issues: (1) whether the ALJ properly considered Claimant's migraine headaches in accordance with policy of the Social Security Administration ("SSA"); (2) whether the ALJ erred in considering opinions of Roberta Kalafut, M.D., an agency examining physician; and (3) whether the ALJ properly considered opinions of Claimant's treating physician, Henry Fosah, M.D. *See* Pl.'s Mem. at 4.

### A. Migraine Headaches

At Step 2, the ALJ found five severe impairments, but found Claimant's migraine headaches non-severe because (1) she was only prescribed pain medication; (2) she "received little treatment

for migraine headaches during the relevant period"; and (3) September 2013 diagnostic images were normal. R. 16.[8]  Claimant argues that, by finding her migraines non-severe, the ALJ erred under unambiguous SSA policy as set out in SSR 96-3p,[9] SSR 85-28,[10] and *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985).  Pl.'s Mem. at 5.

In 1985, the SSA issued a statement to clarify its policy for determining when an impairment may be found not severe. *See* SSR 85-28, 1985 WL 56856, at *1-2.  SSR 85-28 set out the following guidance on non-severity of impairments at Step 2:

> An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made at this step when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities).

*Id.* at *3.  Some courts describe this standard as the "minimal effect" standard. *Mills v. Berryhill*, No. 4:16-CV-0331-Y-BL, 2017 WL 3972009, at *7 (N.D. Tex. Aug. 3, 2017) (recommendation of Mag. J.) *adopted by* 2017 WL 3891391 (N.D. Tex. Sept. 6, 2017).  "With minor linguistic or semantic variations, SSR 96-3p uses the same minimal effect standard as SSR 85-28." *Id.* at *8.  While there are cases to the contrary, the minimal effect standard satisfies *Stone*. *See id.* at *9 (addressing issue and considering contrary cases).

---

[8]With respect to Claimant's headaches, the ALJ cited to the following records: Ex. 6F/3 (R. 406); 10F/78-79 (R. 622-23), 85 (R. 629); 13F/4 (R. 899); 15F/7-9 (R. 985-87); and 20F/24 (R. 1315).  Notably, R. 985-86 merely duplicates R. 622-23.

[9]Policy Interpretation Ruling Titles II and XVI: Considering Allegations of Pain and Other Symptoms in Determining Whether a Medically Determinable Impairment is Severe, SSR 96-3p [hereinafter SSR 96-3p], 1996 WL 374181 (S.S.A. July 2, 1996).

[10]Titles II and XVI: Medical Impairments That are Not Severe, SSR 85-28 (PPS-122) [hereinafter SSR 85-28], 1985 WL 56856 (S.S.A. 1985).

Claimant has a documented history of headaches beginning in 2006. On April 24, 2006, Claimant visited the emergency room of Hendrick Medical Center ("ER") complaining of a "migraine" following an assault. R. 579-80. The physician characterized the headache as severe. *See* R. 580. In December 2006, Claimant complained of a headache and received medication. R. 567, 571. The next month, her chief complaint was a congested headache and the ER noted "migraines" as a chronic problem. R. 561. At this ER visit, symptoms included nausea, blurred vision, and light sensitivity. R. 562. Records of Abilene Diagnostic Clinic ("Clinic") show migraine diagnoses in March, September, and October 2007. *See* R. 429-30, 33 (Code 346.20). In October 2007, the ER also treated her for a chronic migraine headache and prescribed Toradol. R. 865-66.

In February 2008, Claimant complained of a headache lasting a week and the ER again listed migraines as a chronic problem. R. 853. The Clinic's records show diagnoses of tension headaches in February and April 2008. *See* R. 424-26 (Code 307.81).[11] The April 2008 record states that "amitriptyline is helping her headaches." R. 424. On July 18, 2008, Claimant complained about a two-day sinus headache resulting in a migraine diagnosis (Code 346.20) and a diagnosis of tension headache (Code 307.81). R. 421. In September 2008 and November 2009, Claimant was positive for headaches. R. 778-79, 825-28. Additionally, in January 2011, while receiving treatment for pregnancy-induced hypertension, she was positive for mild headaches. R. 523.

The foregoing medical records clearly reflect a history of headaches, including migraines, before Claimant's alleged date of onset of disability on August 1, 2011. Prior to that date, the medical record also contains numerous entries that either do not mention headaches or specifically state

---

[11]Next to the standard code, the record contains a non-standard medical acronym, "MCHA," which denotes some sort of headache. *See* R. 424-26. The clinic's records include that acronym when they use Code 307.81.

7

headaches were not present.[12]  Similarly, the medical record contains numerous entries that do not mention headaches during the most relevant period for determining disability.[13]

In any event, following the alleged onset date of disability, the medical record also contains references to headaches, including migraines.  On May 11, 2013, Claimant's chief complaint was hip pain, but a Clinic physician, Lynn M. Robinson, M.D., noted the presence of headaches. R. 406. Although Dr. Robinson developed a medication plan for Claimant's fibromyalgia and hypertension, that plan did not address headaches. R. 407.

About a month later, Claimant visited Dr. Alley with complaints of hypertension. R. 533-34. At that time, Claimant reported "frequent or severe headaches (in back of head when BP is elevated)." R. 534.  Dr. Alley's assessment and plan did not address headaches. *See* R. 536-37.  Two weeks later, Claimant visited Dr. Alley for a headache secondary to new blood pressure medication. R. 530-31.  Claimant described that headache as a "band around head" without associated nausea or vomiting, said it was "not similar to previous headaches," and stated that it occurred within an hour of taking the new medication. R. 531.  Although Dr. Alley discussed the headache, his assess-

---

[12]*See* R. 293-301 (records of Sabarao Daggubati, M.D., dated Oct. 5, 2009, through Mar. 31, 2011); 313-19 ( records of Presbyterian Medical Care dated April and May 2011); 408-14, 417-20, 422-23, 427-28, 431-32 (Clinic records for May, July, October, and December 2007; April, June, September, and November 2008; April 2009; February and October 2010; and February to April 2011); 547-59 (ER records for February and June 2007); 574-77 (ER records from November 2006); 613-17 (ER records for July 2007); 723-76 (ER records for December 2009; February, March, June, July, August, September, and October 2010; and March, April, and May 2011); 785-812 (ER records for November 2008 and February, April, August, and October 2009); 814-24 (ER records for November 2008); 834-51 (ER records for April, June, and September 2008); and 976-78 (ER records dated February 2009 indicating headaches not present).

[13]*See* R. 309-12 (records of Presbyterian Medical Care dated February 2012 and September, October, and November 2011); 334-96 (ER records for July and August 2012 and January and April 2013); 401, 403, 436-48 (records of Daniel Alley, M.D., dated November and December 2012 and January, February, and May 2013); 456-66 (records of Abilene Regional Medical Center dated December 2012 and June 2013); 644-66 (ER records for May and August 2013).  Many of the ER records are duplicated in the administrative record. *Compare* R. 337, 338-39, 341-45, 349, 350-59, 362, 364-70, 374, 375-83, 387, 388, 390-96 *with* R. 667, 670-71, 672-76, 677, 680-89, 690, 693-99, 700, 793-11, 712, 715, 716-22.

ment plan did not set out anything particular to the headache. *See* R. 532.

On July 24, 2013, Claimant began seeing Dr. Fosah as a new patient. R. 971. At that time, Dr. Fosah verified three health problems: (1) spinal stenosis, lumbar; (2) lumbar radiculopathy; and (3) fibromyalgia. *Id.* Claimant also complained about headaches, numbness, and weakness. R. 973. Neurological examination revealed some weakness and an abnormal gait. R. 974. Dr. Fosah's impressions and recommendations did not mention headaches. *See id.* Claimant denied headaches at a September 5, 2013 visit with Dr. Fosah for anxiety. R. 967-68. She also denied headaches at a September 17, 2013 visit with Dr. Fosah for right knee swelling. R. 964-65.

On September 21, 2013, Claimant visited the Hendrick Medical Center ER for a headache and other ailments. R. 622. Associated symptoms were positive for nausea and shortness of breath. *Id.* Physical examination by David Ross, D.O., revealed hypertension. R. 623. His clinical impression was acute migraine headache. *Id.* A CT scan of Claimant's head revealed nothing abnormal. R. 629.

The next month, Claimant visited Dr. Fosah for a cough, shortness of breath, and questions about hypertension. R. 958. Dr. Fosah did not include headaches as a verified problem, but did note Claimant's complaints of headaches. R. 958-59. His course of treatment did not include anything particular to those complaints. *See* R. 959-61. Two months later, at a follow-up visit regarding her hip pain, she again complained about headaches. R. 945-46. Dr. Fosah again did not include headaches as a verified problem and provided no treatment particular to such complaints. *See* R. 945-48.

In March 2014, Claimant completed a biographical questionnaire in which she did not list headaches as a medical problem for which she had received treatment. R. 878-79. Nevertheless, throughout her treatment by Dr. Fosah, medical records show intermittent reports of headaches. *See*

R. 899 (June 20, 2014), 904 (June 16, 2014), 909 (May 2014), 918 (March 27, 2014), 922 (March 24, 2014), 927 (March 3, 2014), 932 (February 2014), 937 (January 27, 2014), 942 (January 1, 2014), 1300 (October 2014), 1313 (August 25, 2014), 1320 (August 14, 2014); 1325 (July 2014).[14] At the June 20, 2014 office visit, Claimant primarily complained of hip pain and presented disability paperwork, but also complained about headaches. R. 898-99. Dr. Fosah noted thirteen health problems but did not specifically list headaches. *See* R. 898. Furthermore, his impressions and recommendations did not address headaches. *See* R. 900-02.

At the August 25, 2014 visit with Dr. Fosah, Claimant reported having a migraine for two days with light and noise sensitivity, nausea, vomiting, and trouble eating. R. 1313, 1315. Although over-the-counter medication helped some, Dr. Fosah prescribed Fiorcet – a medication that had been effective in the past. R. 1313. He suggested that high stress "could be related to her headaches." *Id.* He listed fourteen verified health problems, but did not separately list headaches, despite Claimant's migraine. *See id.* However, he did list Fiorcet as a new medication for headaches under her fibromyalgia impairment. R. 1316.

Similarly, at her next two monthly follow-up appointments, Dr. Fosah again listed fourteen health problems without specifying headaches even though Claimant complained of them. *See* R. 1299-1300, 1307. However, he did verify that Claimant still had a prescription for Fiorcet – one tablet to be taken "every 8 hours as needed for headaches." R. 1299, 1307. And he again considered the headaches as part of Claimant's fibromyalgia. *See* R. 1302, 1310 (listing medications for headaches in fibromyalgia sections of records).

Despite Claimant's arguments, the ALJ applied the proper legal standard when assessing the

---

[14]The administrative record contains some duplicate records. *Compare* R. 898-968 *with* 1210-80.

severity of her impairments at Step 2. The ALJ specifically stated the minimal effect standard set out in SSR 85-28. R. 16. Claimant does not suggest that this is the wrong standard. Indeed, she argues that SSR 85-28, SSR 96-3p, and *Stone* provide the unambiguous policy of the SSA regarding the Step 2 severity standard. Pl.'s Mem. at 5-6. Furthermore, two recent decisions in the Northern District of Texas support finding no error in applying the minimal effect standard. *See Mills v. Berryhill*, No. 4:16-CV-0331-Y-BL, 2017 WL 3972009, at *9 (N.D. Tex. Aug. 3, 2017) (recommendation of Mag. J. addressing issue and considering contrary cases) *adopted by* 2017 WL 3891391 (N.D. Tex. Sept. 6, 2017); *Flowers v. Berryhill*, No. 7:16-CV-0135-O-BP, 2017 WL 2257596, at *4 (N.D. Tex. Apr. 18, 2017) (recommendation of Mag. J.) *accepted by* 2017 WL 2225411 (N.D. Tex. May 22, 2017). Even when considering a migraine headache impairment, an ALJ does not err when he or she states the proper standard and applies it to the evidence of record. *See Conlee v. Colvin*, No. 3:12-CV-0082-SAA, 2013 WL 3467139, at *6-7 (N.D. Miss. June 14, 2013).

Claimant argues that the ALJ improperly applied that standard based on the evidence of this case. It thus appears that she challenges the substantiality of the evidence to support the ALJ's Step 2 finding. In fact, once the ALJ cites the correct Step 2 severity standard, "the only question is whether substantial evidence exists to support the [non-severity] finding." *Musgrove v. Astrue*, No. 3:07-CV-0920-BD, 2009 WL 3816669, at *3 (N.D. Tex. Nov. 13, 2009). Claimant relies on entries in her medical record that show a migraine diagnosis and ongoing complaints of headaches. "However, the diagnosis of symptoms or a condition, without more, is insufficient to establish that a condition is 'severe.'" *Id.* Claimant has the burden to prove "that the diagnosed condition has more than a minimal effect on h[er] ability to engage in work related activities." *Id.*

11

Although Claimant's history of migraine headaches goes back to 2006, she engaged in substantial gainful activity between September 2010 and August 2011. R. 23 (relying on hearing testimony and Ex. 2E). Retaining an "ability to work while experiencing an impairment suggests that the impairment is not severe." *Musgrove*, 2009 WL 3816669, at *3 (quoting *Winget v. Astrue*, No. MO-07-CV-017, 2007 WL 4975206 at *7 (W.D. Tex. Dec.14, 2007)). Furthermore, as the ALJ states, Claimant received little treatment for her headaches during the period of time most relevant to her claim of disability commencing August 1, 2011. Claimant points to no medical record dated between January 2011 and May 2013 that shows complaints of or treatment for headaches of any type, *see* Pl.'s Mem. at 6, and a review of the medical record reveals none. While there are entries in the medical record between the alleged onset date of disability, August 1, 2011, and the date of last insured, December 31, 2013, that reflect complaints of headaches, those records are insufficient to find that substantial evidence does not support the ALJ's non-severity finding. No medical personnel restricted Claimant's work activities due to her headaches. For the most part, the headaches appear well-controlled by medication with only occasional acute flare-ups that warranted a medical visit between May and December 2013. While there are a number of medical entries regarding headaches in 2014 nothing indicates that these were migraine-type headaches or that Claimant's migraine headaches was a severe impairment prior to date last insured on December 31, 2013.

A review of the administrative record in this case shows that substantial evidence supports the non-severity finding of the ALJ. The Court should find that substantial evidence supports the finding that Claimant's headaches – even her migraine ones – do not rise to the level of a severe impairment under the applicable standard.

Claimant argues that the failure to appropriately consider her headaches is not harmless error.

12

Pl.'s Mem. at 8-10. She primarily premises this argument on SSA National Q&A 09-036 (posted Dec. 15, 2009) that she attaches to her brief. Of course, there is no need to address harmless error when there is no error. Nevertheless, a brief discussion of Q&A 09-036 may be helpful. "Because the Commissioner does not contend or argue that Q&A 09-036 is inactive, the Court may utilize it in determining the current appeal." *See Mesecher v. Berryhill*, No. 4:15-CV-0859-BL, 2017 WL 998373, at *5 (N.D. Tex. Mar. 15, 2017). As set out in *Mesecher*, Q&A 09-036 provides pertinent guidance with respect to migraine headaches. *See id.* at *4-5. However, that Q&A provides guidance on determining whether migraine headaches qualify as a medically determinable impairment and how to evaluate such impairment at Step 3. The ALJ in this case found the migraines to be a medically determinable impairment that was non-severe under the proper standard for determining whether an impairment is severe. *See* R. 16. Because the ALJ found the migraine headaches to be a non-severe impairment, he had no need to assess such impairment under the Listings at Step 3. *See Rabel v. Barnhart*, No. SA04-CA-0375-XR, 2005 WL 1388567, at *2 (W.D. Tex. June 8, 2005) ("Only a severe impairment allows for continuation on to step three. At step three, the severe impairment is compared with a list of specific impairments."). Claimant, furthermore, makes no significant effort to show that her migraines were medically equivalent or met the relevant listing set out in Q&A 09-036 (Listing 11.03) and her migraines do not appear to satisfy that listing. For these reasons, Q&A 09-036 has little impact on the issues in this case.

**B. Opinions of Agency Examining Physician**

Claimant argues that the ALJ erred when he assigned great weight to opinions of Dr. Kalafut, an agency examining physician, but failed to include identified limitations in his RFC determination. Pl.'s Mem. at 12-16. On July 14, 2014, Dr. Kalafut conducted a physical examination of Claimant.

*See* R. 1194-1202.  Claimant reported that "she only intermittently uses a cane, and it 'hurts worse

to use the cane than not to use it" R. 1194.  Dr. Kalafut assessed chronic pain syndrome and stated,

among other things, that Claimant "more than likely, would have difficulty lifting anything over 30

pounds" and "[s]ometimes uses a single point cane."  R. 1195.

In addition, Dr. Kalafut completed a "Medical Source Statement of Ability to do Work-

Related Activities (Physical)."  *See* R. 1197-1202.  In the first section of that medical source state-

ment, she found that Claimant could lift/carry up to twenty pounds continuously and up to fifty

pounds occasionally, but could not lift or carry more than fifty pounds.  R. 1197.  She further found

that Claimant did not "require the use of a cane to ambulate" and noted that Claimant "carries it in

her hand."  R. 1198.

The ALJ noted several opinions of Dr. Kalafut, including that Claimant (1) could lift and

carry up to twenty pounds continuously and lift up to fifty pounds occasionally and (2) "does not

need to use an assistive device to ambulate."  R. 22.  After noting the various findings and opinions

of Dr. Kalafut, the ALJ "assigned great weight to the opinion of Dr. Kalafut, as it is consistent with

the reliable evidence of record and based on a thorough and precise examination grounded on trusted

objective techniques."  *Id.*

Although the ALJ purports to assign great weight to a specific singular opinion of Dr.

Kalafut, his decision reflects identification and consideration of multiple opinions of Dr. Kalafut

within the same medical source statement.  When identifying and considering relevant opinions,

ALJs "must remember" that some medical records, such as medical source statements provided by

a source, "may actually comprise separate medical opinions regarding diverse physical and mental

functions, such as walking, lifting, seeing, and remembering instructions, and that it may be neces-

sary to decide whether to adopt or not adopt each one." Titles II & XVI:  Med. Source Ops. on Issues Reserved to the Comm'r, SSR 96-5p, 1996 WL 374183, at *4 (S.S.A. July 2, 1996).  While the ALJ uses the singular "opinion" when assigning weight, there is no doubt that he gave great weight to all the identified opinions of Dr. Kalafut.

Claimant takes issue with the ALJ's disregard for Dr. Kalafut's statements about lifting more than thirty pounds and using a cane.  However, it is clear from the medical source statement that Dr. Kalafut made her specific medical opinions about lifting and use of a cane despite her earlier statement that lifting more than thirty pounds would more than likely be difficult for Claimant and the Claimant's statement about sometimes using a cane.  There is no inconsistency with the statement that Claimant sometimes uses a cane and the opinion that use of a cane is not necessary based on the doctor's physical examination.[15]  Likewise, that Claimant may have difficulty lifting more than thirty pounds is not inconsistent with the specific opinion that Claimant could occasionally lift and carry up to fifty pounds.  That impairments may make a task difficult does not necessarily preclude the task on an occasional basis.  The Court should find no error in the ALJ according great weight to Dr. Kalafut's opinions while also not including a need for an assistive device or a limitation about lifting more than thirty pounds.

## C.  Opinions of Treating Physician

Claimant argues that the ALJ erred by not properly weighing a May 19, 2014 medical opinion of her treating physician, Dr. Fosah.  Pl.'s Mem. at 17-24.  Although Claimant considers that medical source statement to be a single opinion from Dr. Fosah, the ALJ correctly summarizes various opin-

---

[15]As discussed more thoroughly in the next section, that Claimant's treating physician opined that she needs a cane, R. 894, does not dictate such a limitation.  An ALJ may discount an opinion of a treating source when there is a competing first-hand medical opinion to the contrary.

ions within that medical source statement before discounting the opinions in total as "not supported by the reliable medical evidence of record showing few physical and objective findings supporting the claimants' allegations of pain and inconsistent with the opinions of the consultative examiner and medical consultants." R. 21-22.

When considering whether a claimant is disabled, the Commissioner considers the medical evidence available, including medical opinions.[16] *See* 20 C.F.R. §§ 404.1527(b), 416.927(b) (effective Aug. 24, 2012, to Mar. 26, 2017). Medical opinions may come from treating sources (for example primary care physicians), non-treating sources (physicians who perform a single examination of the claimant), or non-examining sources (a physician who reviews only the claimant's medical record). *See generally* 20 C.F.R. §§ 404.1502, 416.902 (effective June 13, 2011, to Mar. 26, 2017). The Fifth Circuit has "long held that ordinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) (quoting *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985)). Nevertheless, even opinions from a treating source are "far from conclusive," because ALJs have "the sole responsibility for determining the claimant's disability status." *Id.*; *accord Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir. 1994).

---

[16]As explained to claimants: "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (effective Aug. 24, 2012, to Mar. 26, 2017). These regulations, however, reserve some issues to the Commissioner "because they are administrative findings that are dispositive of a case" – opinions on such issues do not constitute medical opinions under the regulation. *Id.* §§ 404.1527(d), 416.927(d). Effective March 27, 2017, § 404.1527 sets out a two-tiered approach for applying the regulation: "For claims filed (see § 404.614) before March 27, 2017, the rules in this section apply. For claims filed on or after March 27, 2017, the rules in § 404.1520c apply." Section 416.927 does the same for Title XVI. Regardless, the pertinent version of the regulations for this appeal remains the one in effect when the ALJ issued his decision. *See Young v. Berryhill*, No. 16-20786, 2017 WL 2312859, at *2 n.3 (5th Cir. May 26, 2017) (per curiam).

16

"After identifying relevant medical opinions of treating physicians, ALJs must determine whether any such opinion is entitled to controlling weight." *Bentley v. Colvin*, No. 3:13-CV-4238-P, 2015 WL 5836029, at *7 (N.D. Tex. Sept. 30, 2015) (citing 20 C.F.R. § 404.1527(c)(2) and its Title XVI counterpart, § 416.927(c)(2)). As mentioned in the previous section, ALJs must remain cognizant that some medical records may constitute separate medical opinions that may require individual decisions to adopt or reject. *See* Titles II & XVI: Med. Source Ops. on Issues Reserved to the Comm'r, SSR 96-5p, 1996 WL 374183, at *4 (S.S.A. July 2, 1996).

The regulations provide a six-factor detailed analysis to follow unless the ALJ gives "a treating source's opinion controlling weight." 20 C.F.R. § 404.1527(c)(1)-(6), 416.927(c)(1)-(6) (effective Aug. 24, 2012, to Mar. 26, 2017).[17] "When a treating source has given an opinion on the nature and severity of a patient's impairment, such opinion is entitled to controlling weight if it is (1) 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and (2) 'not inconsistent with' other substantial evidence." *Wilder v. Colvin*, No. 3:13-CV-3014-P, 2014 WL 2931884, at *3 (N.D. Tex. June 30, 2014) (quoting *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000)); *accord* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (effective Aug. 24, 2012, to Mar. 26, 2017). Furthermore, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [the

---

[17]These factors are: (1) the examining relationship; (2) the treatment relationship, including the length of time the physician has treated the claimant, the frequency of examination by the physician, and the nature and extent of the treatment relationship; (3) support for the physician's opinions in the medical evidence of record; (4) consistency of the opinions with the record as a whole; (5) the specialization of the treating physician; and (6) any others factors brought to the ALJ's attention. 20 C.F.R. §§ 404.1527(c), 416.927(c) (effective Aug. 24, 2012, to Mar. 26, 2017). Even with the 2017 regulatory amendments, these factors remain relevant for claims filed before March 27, 2017. *See* 20 C.F.R. §§ 404.1527(c), 416927(c) (effective Mar. 27, 2017).

regulations].ʺ *Newton*, 209 F.3d at 453.

In addition, ʺthe ALJ may re-contact a treating physician or other medical source if there is insufficient evidence to determine whether the claimant is disabled.ʺ *Perry v. Colvin*, No. 3:13-CV-2252-P, 2015 WL 5458925, at *7 (N.D. Tex. Sept. 17, 2015); *accord Jones v. Colvin*, No. 4:13-CV-818-A, 2015 WL 631670, at *7 (N.D. Tex. Feb. 13, 2015) (accepting recommendation of Mag. J. which recognized that, effective March 26, 2012, this new regulation replaced the former mandatory requirement of § 404.1512(e) applied in *Newton*); 20 C.F.R. §§ 404.1520b(c)(1), 416.920b(c)(1). Further, ʺif after weighing the evidence [the ALJ] cannot reach a conclusion about whether [the claimant is] disabled,ʺ §§ 404.1520b(c) and 416.920b(c) provide ʺvarious options, including re-contacting a treating physician or other medical source, to resolve an inconsistency or insufficiency of evidence.ʺ *Bentley*, 2015 WL 5836029, at *8 (citing 20 C.F.R. §§ 404.1520b(c), 416.920b(c) (effective Mar. 26, 2012, to Mar. 26, 2017)).

ALJs who find a treating source opinion not entitled to controlling weight must consider the six factors to properly assess the weight to give such opinions. *Newton*, 209 F.3d at 456. However, ʺ*Newton* requires only that the ALJ 'consider' each of the [regulatory] factors and articulate good reasons for its decision to accept or reject the treating physician's opinion. The [ALJ] need not *recite* each factor as a litany in every case.ʺ *Jeffcoat v. Astrue*, No. 4:08-CV-672-A, 2010 WL 1685825, at *3 (N.D. Tex. April 23, 2010) (emphasis added); *accord Emery v. Astrue*, No. 7:07-CV-084-BD, 2008 WL 4279388, at *5 (N.D. Tex. Sept. 17, 2008); *Burk v. Astrue*, No. 3:07-CV-899-B, 2008 WL 4899232, at *4 (N.D. Tex. Nov. 12, 2008) (accepting recommendation of Mag. J.). *Newton*, furthermore, does not require the detailed analysis when ʺthere is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another.ʺ

18

209 F.3d at 458. Likewise, the detailed analysis under *Newton* is not necessary when the ALJ has weighed the treating physician's opinion against opinions of other treating or examining physicians who "have specific medical bases for a contrary opinion." *Id.*

The ALJ, as fact-finder, "has the sole responsibility for weighing evidence and may choose whichever physician's diagnosis is most supported by the record." *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991). ALJs have considerable discretion in assigning weight to medical opinions and may reject the opinion of a physician when the evidence supports a contrary conclusion. *Newton*, 209 F.3d at 455-56. Additionally, for good cause shown, an ALJ may assign little or no weight to an opinion from a treating source. *Id.* "Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 456.

On May 19, 2014, Dr. Fosah completed a "Medical Opinion Re: Ability to Do Physical Activities." R. 893-95. He identified three diagnoses (spinal stenosis of the lumbar, hip pain, and fibromyalgia) and assessed a poor prognosis. R. 893. He stated the following estimates of Claimant's functional limitations: (1) can only walk two city blocks without resting; (2) can continuously sit for only fifteen minutes and continuously stand for ten minutes; (3) can only sit for less than two hours in eight-hour workday with normal breaks; (4) needs to be able to shift positions at will; (5) needs three to four unscheduled fifteen-minute breaks during a workday; (6) prolonged sitting requires leg(s) to be elevated 30 to 90% of time during a workday; (7) a cane is needed when engaging in occasional standing/walking; (8) can occasionally lift and carry up to ten pounds, but never twenty pounds or more; (9) has significant limitations in repetitive reaching, handling or fingering and can

only use hands to grasp, turn, twist objects for 20% of a workday, use fingers for fine manipulations 20% of a workday, and use arms to reach, including overhead, 10% of workday; and (10) can bend and twist at the waist only 5% of workday. R. 893-94. According to Dr. Fosah, Claimant should avoid exposure to every listed environment: extreme cold and heat; high humidity, fumes, odors, dusts, gases, perfumes, cigarette smoke, soldering fluxes, solvents and cleaners, and chemicals. R. 895. He also identified the following postural limitations: (1) can only occasionally twist, stoop, and bend; and (2) can never crouch or climb stairs or ladders. *Id.* He further opined that Claimant would experience good and bad days and would be absent from work due to her impairments more than twice monthly. *Id.*

Four days after completing that medical opinion questionnaire, Dr. Fosah made two notations in the Claimant's medical record consistent with opinions he expressed in answers on the quest-ionnaire: (1) "sitting or standing for any prolonged period" and (2) "cannot lift any weight more than 10lbs and not able to climb stairs due to hip pain." R. 908. The first notation is reasonably inter-preted as precluding prolonged sitting or standing. The next month, in a June 20, 2014 medical record, Dr. Fosah made the same two notations. *See* R. 898. On July 28, 2014, Dr. Fosah stated that "symptoms of persistent pain in back and knees from osteoarthritis and fibromyalgia prevent her from full time employment."[18] R. 1324.

The ALJ in this case specifically recognized the medical opinion questionnaire and the various opinions stated therein. *See* R. 21-22. He also noted the statements made in the May, June, and July 2014 medical records. *See id.* He recognized that opinions of a treating source, such as Dr.

---

[18]This statement does not qualify as a medical opinion because an opinion on an inability to work is an issue reserved to the Commissioner.

Fosah, are "entitled to great weight unless there is persuasive contradictory evidence." R. 22. However, he found the opinions of Dr. Fosah "not supported by the reliable medical evidence of record showing few physical and objective findings supporting the claimants' allegations of pain and inconsistent with the opinions of the consultative examiner and medical consultants." *Id.*

The ALJ does not specifically address whether any medical opinion of Dr. Fosah is entitled to controlling weight, but the ALJ decision as a whole clearly reveals that the ALJ did not accord any of his opinions controlling weight. The Court should find no error in that assessment because the medical opinions of Dr. Fosah are inconsistent with other substantial evidence.

After a physical examination of Claimant, Dr. Kalafut found that Claimant's "pain level does not correlate to [the doctor's] physical findings"; Claimant was "able to heel and toe walk, squat and do tandem walking"; her "[g]ross and fin movement [we]re unaffected." R. 1195. In addition to the opinions of Dr. Kalafut discussed in the prior section, i.e., Claimant did not need to use a cane and could lift/carry up to twenty pounds continuously and up to fifty pounds occasionally, Dr. Kalafut opined that Claimant could (1) sit four hours without interruption, eight hours in a day; (2) stand or walk one hour without interruption and stand for up to four hours in an eight-hour workday; (3) had no limitations on use of hands or feet; (4) could frequently climb stairs and ramps, balance, stoop, kneel, crouch, and crawl; (5) could only occasionally climb ladders or scaffolds; and (6) had no environmental restrictions. R. 1197-1201. As support for her opinions, Dr. Kalafut consistently noted "normal diagnostic studies," "no objective physical findings," and "subjective complaints of pain." R. 1198-1200.

The ALJ discussed Dr. Kalafut's opinions. R. 22. He recognized that the doctor's physical examination "was relatively normal and showed the claimant was capable of heel and toe walking,

squatting, and tandem walking." *Id.* Given the reliable medical evidence from Dr. Kalafut that controverts the opinions of Dr. Fosah, the ALJ could properly reject Dr. Fosah's medical opinions without performing a detailed analysis of them. The ALJ specifically found that, as a factual matter, the opinions of Dr. Kalafut were more well-founded than those of Dr. Fosah. *See id.* It is apparent that the ALJ weighed the opinions of Dr. Fosah against the opinions of Dr. Kalafut and concluded that Dr. Kalafut had specific medical reasons for the contrary medical opinions and that her opinions were worthy of greater weight. The Court should find no error in the ALJ's consideration of the opinions of Dr. Fosah. On appellate review, the district courts do not reweigh the evidence.

Claimant urges that the Commissioner could have re-contacted Dr. Fosah or obtained testimony from a medical expert rather than simply discount his medical opinions. Pl.'s Mem. at 24. However, the regulations that became effective March 26, 2012, provide a discretionary basis for re-contacting a treating or other source to resolve an inconsistency or insufficiency of evidence when the ALJ cannot make a disability determination after weighing the evidence. *See* 20 C.F.R. §§ 404.1520b(c)(1), 416.920b(c)(1). In this case, the ALJ had sufficient evidence to conclude that Claimant was not disabled from August 1, 2011, through the date of his decision. *See* R. at 24. The Court should find no error in the ALJ making that conclusion after weighing the evidence of record.

## IV.    CONCLUSION

For the reasons set forth in this Report and Recommendation, the Court should find no error with respect to the ALJ's consideration of Claimant's migraine headaches and find that substantial evidence supports the finding that her headaches do not rise to the level of a severe impairment under the applicable standard. Additionally, the Court should find that the ALJ did not err when he accorded great weight to Dr. Kalafut's opinions while not including a need for an assistive device or a limi-

tation about lifting more than thirty pounds in his RFC determination. Finally, the Court should find no error in the ALJ's consideration of the opinions of Claimant's treating physician, Dr. Fosah, or in not pursuing discretionary means to obtain additional evidence from Dr. Fosah or another medical expert. The undersigned thus **RECOMMENDS** that the district court **AFFIRM** the Commissioner's decision to deny benefits. Because the parties have not consented to proceed before a United States Magistrate Judge, the undersigned directs the Clerk of Court to **REASSIGN** this case to Senior District Judge Sam R. Cummings in accordance with normal procedures.

A copy of this Report and Recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this Report and Recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the District Court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

**SO ORDERED this** 2 **day of March, 2018.**

E. SCOTT FROST
UNITED STATES MAGISTRATE JUDGE